**RECORD NOS. 14-1517(L); 14-1553 XAP**

In The

# United States Court Of Appeals

## For The Fourth Circuit

**INTERTAPE POLYMER CORP.,**

*Petitioner/Cross-Respondent,*

**v.**

**NATIONAL LABOR RELATIONS BOARD,**

*Respondent/Cross-Petitioner.*

**ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR ENFORCEMENT OF A DECISION AND ORDER OF THE NATIONAL LABOR RELATIONS BOARD**

––––––––––––––

**REPLY BRIEF OF PETITIONER/CROSS-RESPONDENT**

––––––––––––––

**Michael D. Carrouth, Esquire**
**Reyburn W. Lominack, III, Esquire**
**FISHER & PHILLIPS LLP**
**1320 Main Street, Suite 750**
**Columbia, South Carolina 29201**
**(803) 255-0000**

*Attorneys for Petitioner/Cross-Respondent*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iii

I.   INTRODUCTION.................................................................1

II.  REPLY ARGUMENTS ........................................................1

    A.   SURVEILLANCE.........................................................1

        1.   The Board's "out of the ordinary" standard cannot be rigidly applied when Section 8(c) rights are involved ........................................................2

        2.   The Board must balance Section 8(c) rights and Section 7 rights when both are implicated by a Section 8(a)(1) claim.........................................3

        3.   The Board has appropriately balanced Section 8(c) and Section 7 in other surveillance cases......................6

        4.   The panel majority's holding infringes on IPG's Section 8(c) rights ........................................10

    B.   CONFISCATION .......................................................13

        1.   Not closely related to the complaint ............................13

        2.   No change in break room housekeeping policy in response to union activity .............................15

    C.   INTERROGATION .....................................................17

        1.   Exceptional circumstances warrant overturning the ALJ's credibility findings.......................................19

        2.   Nature of information sought ......................................21

i

3. Identity of the questioner ........................................... 24

4. Truthfulness of the reply ........................................... 24

III. CONCLUSION ................................................................ 25

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Aladdin Gaming, LLC,*
   345 N.L.R.B. 585 (2005),
   *petition for review denied sub nom,*
   *Local Joint Exec. Bd. v. NLRB,*
      515 F.3d 942 (9th Cir. 2008) ................................... 6, 7, 8, 10

*Allegheny Ludlum Corp.,*
   333 N.L.R.B. 734 (2001) .................................................................. 5

*Allegheny Ludlum Corporation v. NLRB,*
   104 F.3d 1354 (D.C. Cir. 1997)................................................ 4, 5, 6

*Allegheny Ludlum Corporation v. NLRB,*
   301 F.3d 167 (3rd Cir. 2002) ........................................................... 6

*Arrow-Hart, Incorporated,*
   203 N.L.R.B. 403 (1973) ....................................................... 8, 9, 10

*Burlington Industries, Inc. v. NLRB,*
   680 F.2d 974 (4th Cir. 1982) ......................................................... 21

*Cardinal Home Products,*
   338 N.L.R.B. 1004 (2003) ....................................................... 22, 24

*Continental Industries,*
   279 N.L.R.B. 920 (1986) ............................................................... 22

*Eddyleon Chocolate Co.,*
   301 N.L.R.B. 887 (1991) ................................................................. 3

*Eldeco, Inc. v. NLRB,*
   132 F.3d 1007 (4th Cir. 1997) ....................................................... 19

*Flamingo Hilton-Reno,*
321 N.L.R.B. 409 (1996) ................................................................. 5

*John W. Hancock Jr., Inc.,*
337 N.L.R.B. 1223 (2002), *enforced,*
73 Fed. Appx. 617 (4th Cir. 2003) ........................................... 23, 24

*Local Joint Exec. Bd. v. NLRB,*
515 F.3d 942 (9th Cir. 2008) .................................................... 6, 7

*Metal Industries, Inc.,*
251 N.L.R.B. 1523 (1980) ............................................................. 2

*NLRB v. Gissel Packing Co.,*
395 U.S. 575 (1969) ........................................................... *passim*

*NLRB v. Holly Farm Poultry Industries, Inc.,*
470 F.2d 983 (4th Cir. 1972) ...................................................... 21

*NLRB v. Southern Maryland Hospital Ctr.,*
916 F.2d 932 (4th Cir. 1990) ........................................................ 2

*NLRB v. Transpersonnel, Inc.,*
349 F.3d 175 (4th Cir. 2003) ...................................................... 12

*Phillips 66 (Sweeny Refinery),*
360 N.L.R.B. No. 26, slip op. (2014) ........................................... 23

*Sands Hotel & Casino, San Juan,*
306 N.L.R.B. 172 (1992) ............................................................... 2

*Sony Corp. of America,*
313 N.L.R.B. 420 (1993) ............................................................ 4, 5

*Sprain Brook Manor Nursing Home, LLC,*
351 N.L.R.B. 1190 (2007) .............................................................. 2

*Struksnes Construction Co.,*
165 N.L.R.B. 1062 (1967) ........................................................... 4, 5

*Toma Metals, Inc.*,
    342 N.L.R.B. 787 (2004) ................................................................ 24

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951) ...................................................................... 17

*Winchester Spinning Corp. v. NLRB*,
    402 F.2d 299 (4th Cir. 1968) ................................................. 22, 23

**Statutes:**

29 U.S.C. § 157 ................................................................... *passim*

29 U.S.C. § 158(a)(1) ......................................................... *passim*

29 U.S.C. § 158(c) .............................................................. *passim*

29 U.S.C. § 160(e) ....................................................................... 17

# I.  INTRODUCTION

The National Labor Relations Board's ("the Board") brief fails to offer any convincing arguments for why this Court should grant its cross-application for enforcement, and deny Intertape Polymer Corp.'s ("IPG") petition for review, of the Board's May 23, 2014 Order (JA 678-94). As discussed in IPG's opening brief, and as elaborated on below, the Board's findings of fact with respect to the issues on review are not supported by substantial evidence, and its legal conclusions are not rational or consistent with the National Labor Relations Act ("the Act").

# II.  REPLY ARGUMENTS

## A. SURVEILLANCE

The Board argues that substantial evidence supports the panel majority's finding of unlawful surveillance, because IPG's managers acted "out of the ordinary" by distributing fliers at the plant gate at the same time pro-union supporters were passing out fliers. (NLRB Br. 42-50). Like the panel majority's decision, the Board's arguments are premised on a fundamental misapprehension of the law.

### 1. The Board's "out of the ordinary" standard cannot be rigidly applied when Section 8(c) rights are involved

This Court has affirmed the Board's well-established rule that an employer violates Section 8(a)(1) when it surveils employees engaged in Section 7 activity by observing them in a way that is "out of the ordinary" and thereby coercive. *See NLRB v. Southern Maryland Hospital Ctr.*, 916 F.2d 932, 938 (4th Cir. 1990) ("It is firmly established that management officials may observe public union activity . . . without violating § 8(a)(1) of the Act, unless such officials do something 'out of the ordinary.'") (quoting *Metal Industries, Inc.*, 251 N.L.R.B. 1523 (1980)).

In a typical surveillance case, the Board's "out of the ordinary" standard provides a clean framework for the analysis: if a supervisor observes open union activity in a way that he or she does not normally observe employees, the supervisor's conduct is unlawful. *See, e.g., Sprain Brook Manor Nursing Home, LLC*, 351 N.L.R.B. 1190, 1191 (2007) (finding unlawful surveillance where manager, who does not normally work on Saturdays, went to facility on Saturday and observed employees' Section 7 activity); *Sands Hotel & Casino, San Juan*, 306 N.L.R.B. 172 (1992) (finding unlawful surveillance where employer posted security guards near employee entrances, and guards used binoculars to view

2

employees' Section 7 activity); *Eddyleon Chocolate Co.*, 301 N.L.R.B. 887, 888 (1991) (finding unlawful surveillance where company president sat in his car and watched employees engaging in Section 7 activity).

But where, as here, a supervisor's alleged "observation" emanates from behavior that, although atypical, is protected by Section 8(c) of the Act, the Board's "out of the ordinary" standard cannot be rigidly applied to resolve the Section 8(a)(1) claim. This is not to say that Section 8(c) automatically immunizes a supervisor's otherwise unlawful behavior—it simply means the Board must balance competing rights when determining whether a violation has occurred.

### 2. The Board must balance Section 8(c) rights and Section 7 rights when both are implicated by a Section 8(a)(1) claim

In *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969), the United States Supreme Court held that employer free speech rights under Section 8(c) and employee free association rights under Section 7 are equal and must be balanced when both rights are implicated in a Section 8(a)(1) case. The Court explained, "[A]n employer's rights cannot outweigh the equal rights of the employees to associate freely, as those rights are embodied in § 7 and protected by § 8(a)(1) and the proviso to § 8(c)." *Id.* at 617.

3

In *Allegheny Ludlum Corporation v. NLRB*, 104 F.3d 1354, 1363 (D.C. Cir. 1997), the D.C. Circuit Court of Appeals, relying on *Gissel*, admonished the Board for failing to balance "the potentially conflicting mandates of Section 8(a)(1) and Section 8(c)" implicated when an employer seeks to include images of employees in a campaign video. The pertinent issue on review was whether the Board erred in finding that the employer engaged in unlawful "polling" when it sought employees' consent to use footage of them in a video.

The "potentially conflicting mandates" at issue in *Allegheny Ludlum* involved the employer's Section 8(c) right to make a campaign video using footage of employees, and the employees' Section 7 right not to be "polled" about their union sentiments.[1] According to the D.C. Circuit, *Sony Corp.*'s explication of an employer's obligation to obtain the consent of all employees featured in anti-union videotapes "put the Board's 'polling' doctrine on a collision course with the free speech rights of employers

---

[1]In *Struksnes Construction Co.*, 165 N.L.R.B. 1062 (1967), the Board held that an employer's attempt to ascertain employee views and sympathies regarding unionism through "polling" impinged on the employees' Section 7 rights in the absence of certain safeguards. In *Sony Corp. of America*, 313 N.L.R.B. 420 (1993), the Board held that an employer's use of employees' images in a campaign video without their consent violated Section 8(a)(1).

under Section 8(c)." *Id.* at 1358. In other words, the Board's *Struksnes* and *Sony Corp.* decisions created a troubling paradox: while an employer could theoretically exercise its free speech right to use videotaped footage of consenting employees during a campaign, it could not effectively obtain their consent without violating the Board's prohibition against polling.

Notwithstanding these "potentially conflicting mandates," the *Allegheny Ludlum* Board "made no mention of the Section 8(c) rights of the employer" in its underlying decision. *Allegheny Ludlum*, 104 F.3d at 1363.[2] Consequently, the D.C. Circuit remanded the case for the Board to resolve the conflict by balancing the competing Section 8(c) rights of the employer with the Section 7 rights of the employees. *Id.* at 1364.

On remand, the Board adopted a new framework for analyzing claims alleging that an employer unlawfully polled employees in connection with soliciting their consent to be included in an anti-union video. *See Allegheny Ludlum Corp.*, 333 N.L.R.B. 734 (2001). The Third Circuit Court of Appeals, which was called upon to review the remanded

---

[2]The Court also pointed out that, in a similar case, *Flamingo Hilton-Reno*, 321 N.L.R.B. 409 (1996), the Board did not "attempt to balance the Section 8(c) freedom of expression right of the employer against the Section 7 associational rights of employees." *Allegheny Ludlum*, 104 F.3d at 1363.

decision, found that, this time, the Board properly balanced Section 8(c) and Section 7. *See Allegheny Ludlum Corporation v. NLRB*, 301 F.3d 167, 178 (3rd Cir. 2002) ("We conclude that the Board's decision [on remand from the D.C. Circuit] is a rational resolution of the tension between the employer's First Amendment rights and the employees' right to organize freely.").

The Supreme Court's *Gissel* decision, as construed and applied by the D.C. Circuit Court of Appeals in *Allegheny Ludlum*, cautions the Board not to turn a blind-eye to Section 8(c) when determining whether an employer's conduct interferes with, restrains, or coerces employees in the exercise of their Section 7 rights. Instead, where an employer's Section 8(c) rights are implicated, the Board must balance the potentially conflicting mandates of both provisions of the Act before resolving a Section 8(a)(1) claim.

### 3. The Board has appropriately balanced Section 8(c) and Section 7 in other surveillance cases

In *Aladdin Gaming, LLC*, 345 N.L.R.B. 585 (2005), *petition for review denied sub nom. Local Joint Exec. Bd. v. NLRB*, 515 F.3d 942 (9th Cir. 2008), the Board carefully balanced Section 8(c) and Section 7 when determining whether managers engaged in unlawful surveillance of open

union activity in connection with exercising their free speech rights during an organizing campaign. On separate occasions, managers approached a table in the employee dining room—where employees were soliciting other employees to sign union authorization cards—and interjected their own views about unionization into the conversation. *Id.* at 585-86. One manager actually stood by the employees' table for two minutes before she began to speak. *Id.* at 585. The Complaint alleged, *inter alia*, that the managers' conduct constituted unlawful surveillance. *Id.*

It was unusual for the managers to sit with employees in the dining room, the dissent pointed out, and it was particularly unusual for a manager to "hover" near a group of employees talking and listen to their conversation. *Id.* at 589. The Ninth Circuit Court of Appeals similarly observed, "[One of the managers] ordinarily eats lunch in the employee dining room, but normally sits with human resources employees. She does not usually sit with uniformed employees." *Local Joint Exec. Bd.*, 515 F.3d at 943.

A panel majority of the Board found the irregular conduct of the managers insignificant and dismissed the surveillance allegation. *See Aladdin Gaming*, 345 N.L.R.B. at 586. The majority explained the rationale for its findings as follows:

> Section 8(c) gives an employer representative the right to express an antiunion opinion to employees. Apparently, our colleague would not allow such expression if the employees are engaged in a Section 7 discussion at the time. However, there is nothing in Section 8(c) that even remotely suggests such a limitation. To the contrary, in order to have a free exchange of views in "a market place of ideas," that time would be a logical time for the employer representative to express his opinion. Further, the fact that the employer representative may speak when an employee is talking does not take the employer remarks out of Section 8(c). At worst, this is rude, but it is not unlawful. Of course, employees may listen to the employer representative while he speaks, and, to this extent, stop their Section 7 conversation. But, this is the essence of the exchange of ideas. After the employer representative has spoken, the employees can respond, or ignore him and continue their conversation. Finally, this is not a case when an employer representative lurks in the background to surreptitiously hear the employee conversation. Rather, this is a case where the representative openly stood by the employee table for 2 minutes until he began to speak.

*Id.* at 586.

The Board similarly balanced competing Section 8(c) and Section 7 rights in *Arrow-Hart, Incorporated*, 203 N.L.R.B. 403 (1973), a case discussed in detail in IPG's opening brief due to its similarities to the case at bar. (IPG Br. 17-25). In its brief, the Board contends that IPG

"misunderstands" *Arrow-Hart*. (NLRB Br. 48). It is the Board, however, that clearly misunderstands the case.

The Board attempts to distinguish *Arrow-Hart* on the grounds that it was "common practice" for the supervisors to gather around a desk at the end of the hall when employees arrived in the morning. (NLRB Br. 49). But as IPG made clear in its opening brief (IPG Br. 20-21), the alleged surveillance in *Arrow-Hart* did not occur at the desk at the end of the hall—it allegedly occurred when the supervisors approached the glass entrance door to distribute literature to employees who would not be walking all the way down the hall to the desk. *See Arrow-Hart*, 203 N.L.R.B. at 406 ("If, *as they approached the front door to reach some of the employees*, the supervisors also looked out the door—after all, it is made of glass—and saw their counterparts giving out their election material, it was something that could hardly be avoided in any event.") (emphasis added). This is a key distinguishing fact.

As hard as it tries, the Board cannot dodge the fact that it was "out of the ordinary" for the *Arrow-Hart* supervisors to walk to and from the entranceway and distribute campaign literature to employees as they arrived for work. Despite this "out of the ordinary" behavior—coupled

9

with the "out of the ordinary" behavior of the plant manager greeting employees as they arrived, and the "out of the ordinary" placement of a trashcan labeled "IUE TRASH" just inside the door—the *Arrow-Hart* Board found, on balance, that the supervisors' Section 8(c) rights could not be eclipsed by the employees' Section 7 activity.

The Board's *Aladdin Gaming* and *Arrow-Hart* decisions illustrate that Section 8(a)(1) surveillance claims cannot be considered in a vacuum when the alleged unlawful observation is incidental to the exercise of Section 8(c) rights. Otherwise, the Board risks violating the well-settled principle that "an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the Board." *Gissel*, 395 U.S. at 617.

### 4. The panel majority's holding infringes on IPG's Section 8(c) rights

The panel majority did not give due consideration to IPG's Section 8(c) rights in this case. It mechanically applied the "out of the ordinary" standard it applies in surveillance cases where no Section 8(c) rights are involved. As argued in IPG's opening brief, the majority's decision imposes a new and significant limitation on employer free speech, thereby infringing on IPG's Section 8(c) rights. (IPG Br. 23).

10

In its brief, the Board attempts to downplay the impact of the decision by proffering that IPG has other "viable options" to communicate its views on unionization, such as through morning meetings and PowerPoint presentations. (NLRB Br. 48). This is an incredulous reading of Section 8(c).

Contrary to the Board's suggestion, Section 8(c) does not just protect the expression or dissemination of views, argument, or opinion when no viable alternatives for expressing or disseminating those arguments, or opinions exist. Rather, Section 8(c) protects "[t]he expressing of *any* views, argument, or opinion, or the dissemination thereof . . . ." 29 U.S.C. § 158(c) (emphasis added). Thus, it is immaterial to the analysis how many alternatives IPG had to express its viewpoint—they would all be lawful if they contained "no threat of reprisal or force or promise of benefit." *Id.*

Moreover, because Section 8(c) and Section 7 rights are equal per *Gissel*, IPG should not have had to elect an alternative method of expressing its views during the campaign simply because the employees showed up to express their views at the same time and at the same

location. This is particularly true where it is undisputed that IPG's managers distributed first on April 24. (JA 93-95, 148-49, 400-01).

The Board also fails to persuade by arguing that the coerciveness of the managers' presence at the gates was illustrated by the fact that no employees took union literature while the managers were there. (NLRB Br. 45). First and foremost, the actual impact of the managers' presence at the gates is irrelevant to a determination of whether the conduct was unlawful. *See NLRB v. Transpersonnel, Inc.*, 349 F.3d 175, 180 (4th Cir. 2003) (in determining whether an employer's actions affect conduct protected by Section 7, "[i]t does not matter whether the particular conduct by the employer was actually coercive").

Second, the record does not fully support the Board's conclusory assertion. While two of the General Counsel's witnesses—R.V. Dantzler and John Jordan—testified that the managers' presence caused employees to not want to take the Union's literature (JA 93-96, 203-05), this was pure speculation on their part. The General Counsel offered no witnesses to testify that the actual reason they did not take Union literature was because the managers were present.

IPG, on the other hand, offered the testimony of Audrey Baker, who explained that she did not take the Union's literature because she "didn't want to get involved with it." (JA 492). She added, "It wasn't for me, so I didn't get involved." (JA 492). She then directly confirmed that the fact that managers were passing out literature at the same time as pro-union employees had no impact on her decision not to take the Union literature. (JA 492).

In short, the panel majority's legal conclusions are not rational or consistent with the Act. The decision ignores the plain language of Section 8(c), as well as Supreme Court and its own precedent construing it. Consequently, the Court should not enforce this part of the Board's Order.

## B. CONFISCATION

The Board argues that substantial evidence supports its finding that IPG changed its break room housekeeping policy in response to union activity. (NLRB Br. 26-42). The Board's arguments are unavailing.

### 1. Not closely related to the complaint

The Board argues that its unlawful promulgation finding is "closely related" to the complaint allegation of disparate enforcement because they "concern the same set of facts—Williams' treatment of union

13

literature in the break room during the union campaign." (NLRB Br. 35). This argument is flawed because it assumes that Williams' treatment of union literature in the break room during the union campaign is the *only* fact critical to resolving both allegations.  It is not.

As explained in IPG's opening brief, to prove a claim that IPG unlawfully changed its break room housekeeping policy in response to union activity, the Board must also know when and why the change allegedly occurred. (IPG Br. 31). When and why the change allegedly occurred, however, is irrelevant to resolving whether Williams disparately enforced the policy. Thus, the Board's argument that the unlawful promulgation finding and the disparate enforcement allegation "concern the same facts" is unpersuasive.

The Board next argues that the unlawful promulgation finding and the disparate enforcement allegation are "closely related" because they "both concern Section 8(a)(1) and require the Board to determine the same issue—whether the Company's treatment of union literature interfered with the employees' Section 7 right to engage in protected concerted activity." (NLRB Br. 36). The Board overgeneralizes to support this argument.

14

Section 8(a)(1) is an extremely broad statute that encompasses countless violations. Consequently, the fact that an unlawful promulgation theory and an unlawful disparate treatment theory both implicate Section 8(a)(1) says little to nothing about their relatedness. A straightforward example plainly illustrates this concept:

It is a violation of Section 8(a)(1) for an employer to threaten its employees with plant closure. It is also a violation of Section 8(a)(1) to maintain a handbook policy prohibiting employees from talking about their salaries. But the fact that both allegations require the Board to determine whether the employer interfered with employees' Section 7 right to engage in protected concerted activity does not make the two allegations "closely related." Such a narrow reading of the Board's "closely related" doctrine would render it virtually meaningless.

## 2. No change in break room housekeeping policy in response to union activity

The Board argues that substantial evidence supports its finding that IPG changed its break room housekeeping policy in response to union activity. (NLRB Br. 26-34). In particular, the Board points to Faith Epps' testimony that on three occasions in March 2012, Supervisor Bill Williams discarded literature she had left in the break room, and John

Jordan's testimony that on one occasion in April 2012, Supervisor Chuck Becknell told him he could not leave union literature in the break room. (NLRB Br. 28-29). Even accepting this testimony as credible, it proves nothing about the ultimate issue, which is whether IPG changed its break room housekeeping policy in response to union activity.

IPG's witnesses consistently testified that supervisors cleaned up the break rooms after breaks were over as a matter of course well before the union activity began. (JA 412-13, 439, 532, 561-62). On this issue, Epps testified, at best, that she never *saw* any supervisors clean the break room prior to the union activity. (JA 300-02). As IPG noted in its opening brief, it is not surprising that Epps never saw any supervisors clean the break room prior to the union activity, because, until she began distributing union literature, she had no reason to be in the break room after her break ended. (IPG Br. 37, n. 10).

For his part, Jordan did not testify at all about IPG's break room housekeeping policy, either before the union activity or after. Instead, Jordan simply testified that, in April 2012, Becknell told him he could no longer distribute union literature in the break room. (JA 202-03). The Board obviously gave no credence to this testimony in its decision,

16

however, because it is irrelevant to the issue of IPG's break room housekeeping policy.

Epps' and Jordan's testimony comes nowhere close to supporting the conclusion that IPG changed its break room housekeeping policy in response to union activity. Again, the Board's findings of fact must be "supported by substantial evidence on the record considered as a whole" to be enforced. 29 U.S.C. § 160(e). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). No reasonable mind could accept Epps' testimony as adequate to support the conclusion that IPG changed its break room housekeeping policy in response to union activity, and Jordan's testimony was clearly not relevant to the issue decided by the Board.

Consequently, the Court should not enforce this part of the Board's order.

## C. INTERROGATION

The Board argues that substantial evidence supports the panel majority's finding that Supervisor Bill Williams unlawfully interrogated Johnnie Thames on a single occasion in late February or early March

2012. (NLRB Br. 18-26). Before addressing the Board's specific arguments in turn, it bears repeating Thames' testimony on which the majority exclusively rested its conclusions:

Q.    Now, did any supervisor ever talk to you about your union activities?

A.    Yeah, Bill Williams.

Q.    Bill Williams.

A.    Yes, sir.

Q.    Okay. And when did he talk with you?

A.    He talked to me about three or four times. He came to me, you know, mentioned, asked me what I think about the –

Q.    No. When was this?

A.    It was in – I don't –

Q.    What month?

A.    I don't know exactly the month.

Q.    In relation to when you signed [the authorization] card, was it – when was it?

A.    It was after I signed the card.

Q.    And you signed the card February 10th, was it?

A.    Yes, sir.

Q.    About how long after you signed the card?

A.    About two or three weeks after.

Q.    Okay. And when did he talk with you?

A.    He came upstairs when I was working and –

Q.    This is Mr. Bill Williams?

A.    Mr. Bill Williams came upstairs when I was working and he was asking me what I think about the Union, and said that it was – if you don't think it's good then, that it can hurt you, and so I didn't respond to him. I just walked away.

(JA 233-34).

Notably, Thames did not clarify or amplify his testimony about this alleged conversation, and no other witnesses testified about the event. Supervisor Williams denied ever asking Thames what he thought about the Union. (JA 524).

### 1. Exceptional circumstances warrant overturning the ALJ's credibility findings

The Court should accept credibility based factual findings absent "exceptional circumstances," which exist when credibility determinations are "unreasonable, contradict[] other findings of fact, or [are] based on an inadequate reason or no reason at all." *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997) (citation omitted). If such "exceptional circumstances" do not exist in this case, it is difficult to conceive of a situation in which they do.

As the Board points out in its brief, the ALJ credited Thames as offering a "detailed account" and having a "strong recall" of the alleged

conversation with Williams. (NLRB Br. 24). Again, the above-excerpt from the hearing transcript reflects the entirety of Thames' testimony about this issue. To characterize Thames' testimony—particularly that describing the substance of the alleged conversation with Williams—as "detailed" and based on a "strong recall" is shocking, to say the least.

Thames testified that Williams talked to him three or four times about his union activities. (JA 233). Ultimately, however, he only discussed one alleged instance. Thames' best guess was that this one instance occurred two or three weeks after he signed a union authorization card on February 10, 2012. (JA 234). This was as close to "detailed" as Thames ever got.

Thames' description of the substance of the alleged conversation can only reasonably be characterized as disjointed and confusing. Thames testified that Williams "was asking him what he thought about the Union" (JA 234), but Thames never explained whether Williams directly asked him what he thought about the Union, or whether Thames simply inferred as much from a general (and otherwise lawful) conversation he and Williams were having about the merits of unionization. The ALJ had

no colorable basis for accepting one of these interpretations over the other absent further clarifying testimony, which never materialized.

Indeed, Thames' testimony actually became more clouded as he continued. Thames next testified that Williams said, "[I]f you don't think it's good then, that it can hurt you." (JA 234). How the ALJ could ascribe *any* meaning to such vague testimony is baffling.

Although the Court must defer to the ALJ's determinations of witness credibility, *see NLRB v. Holly Farm Poultry Industries, Inc.*, 470 F.2d 983 (4th Cir. 1972), that deference does not insulate an ALJ's mechanical application of credibility "buzzwords"—like "detailed" and "based on strong recall"—to support a highly unreasonable and illogical conclusion. *See Burlington Industries, Inc. v. NLRB*, 680 F.2d 974, 977 (4th Cir. 1982) (finding no basis to support ALJ's conclusion that two employees were "friendly").

## 2. Nature of information sought

Credibility determinations aside, the panel majority misapplied Board precedent to conclude the surrounding circumstances warranted a finding of unlawful interrogation. First, the Board contends that the nature of the information sought favors a finding of coercion because

Williams approached Thames and directly asked him to reveal his own views on the Union. (NLRB Br. 18). This is a gross mischaracterization of the facts.

Williams did not directly or indirectly ask Thames to reveal his views about the Union. Even accepting Thames' testimony as true, Williams did nothing more than engender a conversation with Thames about unionization when he "was asking [him] what [he] [thought] about the Union." (JA 234). Contrary to the Board's suggestion, merely asking an employee what he thinks about a union is not unlawful. *See Cardinal Home Products*, 338 N.L.R.B. 1004, 1009 (2003) (finding no unlawful interrogation where supervisor asked employee "what he thought about the election"); *Continental Industries*, 279 N.L.R.B. 920, 920 (1986) (finding employer lawfully asked employee "what [he] thought the union could do for [him] . . .").

To support its position, the Board cites *Winchester Spinning Corp. v. NLRB*, 402 F.2d 299, 302-03 (4th Cir. 1968), in which this Court found that substantial evidence supported the Board's finding that a supervisor unlawfully interrogated an employee by asking her, "What do you think about the Union?" In *Winchester*, unlike here, however, the company

"was infected with anti-union animus." *Id.* at 302. Indeed, the same supervisor found to have unlawfully interrogated the employee in that case also told another employee that the plant office had instructed him "to find out what he could in the winding department," and asked her "whether she knew of union activity in that department." *Id.* Thus, the Court held, "in the context of demonstrated employer hostility to the union," the supervisor's questioning was unlawful.

The Board also cites *Phillips 66 (Sweeny Refinery)*, 360 N.L.R.B. No. 26, slip op. 4-5 (2014), in which the Board found that a supervisor asking an employee, "What's going on with the Union?" was lawful, but a different supervisor asking a different employee, "What's your opinion of this union thing?" was unlawful. Clearly, asking an employee what his opinion is about the union is a direct appeal for the employee to reveal his sentiments, unlike asking an employee "his thoughts" about a union in an effort to strike up a conversation about the pros and cons of unionization.

Because Williams' alleged questioning of Thames did not "appear[] to be seeking information upon which to take action against individual employees[,]" it cannot be considered coercive. *John W. Hancock Jr., Inc.*, 337 N.L.R.B. 1223, 1225 (2002), *enforced* 73 Fed. Appx. 617 (4th Cir. 2003).

### 3. Identity of the questioner

The Board next argues that Williams' status as Thames' supervisor weighs in favor of finding the alleged questioning unlawful. (NLRB Br. 19). But the Board has frequently held in other cases that, because the questioning came from an immediate supervisor, rather than a high-level manager, it was not coercive. *See, e.g., Toma Metals, Inc.*, 342 N.L.R.B. 787, 789 (2004) ("Contrary to the judge, we find that Hajko's questioning of Antal was not coercive. Hajko, a low-level supervisor rather than a high-ranking manager, posed the question here."); *Cardinal Home Products, Inc.*, 338 N.L.R.B. 1004, 1009 (2003) ("We find that the questioning here has not been shown to be coercive. The question here was posed not by a high-level manager, but by [a] frontline supervisor . . . ."); *John W. Hancock*, 337 N.L.R.B. at 1225 ("Turning to the identity of the questioner . . ., Kelly was a low-level supervisor . . . . There was certainly no atmosphere of unnatural formality.") (internal quotations omitted).

### 4. Truthfulness of the reply

The Board next argues that Thames' unwillingness to answer Williams' alleged question weighed in favor of finding unlawful interrogation. (NLRB Br. 20). This argument is grounded in pure

speculation. Merely because Thames allegedly walked away upon being asked his thoughts about the Union does not mean he deemed the alleged questioning coercive.

## III.  CONCLUSION

For the foregoing reasons, as well as those set forth in IPG's opening brief, and at any oral argument the Court might permit, the Court should grant IPG's petition for review and deny the Board's cross-application for enforcement.

Respectfully submitted,

/s/ Reyburn W. Lominack
Michael D. Carrouth, Esquire
Reyburn W. Lominack, III, Esquire
FISHER & PHILLIPS LLP
1320 Main Street, Suite 750
Columbia, South Carolina 29201
(803) 255-0000

*Counsel for Petitioner/*
*Cross-Respondent*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)
### Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    this brief contains <u>4,872</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Century</u>.

<u>/s/ Reyburn W. Lominack, III</u>
Reyburn W. Lominack, III, Esquire

*Attorneys for Petitioner/Cross-Respondent*

Dated: January 23, 2015

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on January 23, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Linda Dreeben, Esquire
Julie Broido, Esquire
Nicole Lancia, Esquire
Elizabeth Heaney, Esquire
NATIONAL LABOR RELATIONS BOARD
1099 14th Street, NW, Suite 8116
Washington, DC  20570
(202) 273-1743

*Attorneys for Respondent/Cross-Petitioner*

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Melissa A. Dockery
Melissa A. Dockery
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street, Suite 230
Richmond, VA  23219
(804) 249-7770